# Exhibit 16

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Jimmy Bahn, on behalf of himself and all others similarly situated, Plaintiff, | CASE NO. 2:19-cv-05984-RGK-AS |
| v. | |
| American Honda Motor Co. Inc., Defendant. | |

**Expert Report of Mark Gustafson**

**November 15, 2021**

**Table of Contents**

I.  **Qualifications and Introduction** ........................................................................... 1

    A.  Assignment ................................................................................................. 1

    B.  Qualifications.............................................................................................. 1

    C.  Materials Relied Upon ............................................................................... 2

II.  **Summary of Opinions**.............................................................................................. 2

III.  **Background on the Acura RDX Infotainment System Warranty Extension**................. 3

IV.  **Summary of The Bowron Report's Estimated Retail Price Per Service Contract** ........ 4

V.  **Corrections to The Bowron Report's Estimated Loss Fund**............................................ 6

    A.  The Bowron Report's Number of Exposures is Overstated Because It Incorrectly Assumes that Class Vehicles Can Experience the Same Issue More Than Once.......... 6

    B.  The Bowron Report's Selected Annual Claim Rate is Overstated Because It Fails to Account for Observed Trends in Recent Warranty Data and Appears to be Based on Data Analysis that Does Not Properly Limit the Data to Relevant Warranty Claims... 7

        1. The Bowron Report's Selected Annual Claim Rate is Inconsistent with Observed Trends in Recent Warranty Data.................................................................................. 7

        2. The Bowron Report's Historical Claims Rate Incorrectly Includes Repairs that are Not Covered by the Warranty Extension ..................................................................... 8

VI.  **The Bowron Report Incorrectly Includes Marketing Fees in the Value of the Warranty Extension, Even Though the Extension Will Not Require Any Additional Marketing Efforts** ...................................................................................................... 10

i

## I.     Qualifications and Introduction

### A.     Assignment

1.      I have been retained by King & Spalding, counsel for American Honda Motor Co., Inc. ("Defendant" or "AHM") in the above-captioned action.  I have been asked by counsel for AHM to review and, if appropriate, respond to the expert report submitted by Plaintiffs' expert, Lee M. Bowron.[1]

### B.     Qualifications

2.      I am an economist and Principal with Analysis Group with over 20 years of experience working on litigation and non-litigation engagements.  I have worked across numerous practice areas including commercial damages, intellectual property, employment, insurance, health care, and class actions to analyze issues of liability and damages.  I have analyzed damages in numerous cases including, among others, patent disputes, wrongful termination matters, lost earning capacity claims, fee disputes, and partnership disputes.  In the context of auto defect class action lawsuits, I have analyzed issues related to liability and damages, and I have estimated the financial benefit of warranty extensions to class members for prospective settlements in three prior class actions.

3.      I earned a Master of Public Policy with a concentration in economics from the Kennedy School of Government at Harvard University, where I also taught graduate-level economics as a course assistant.  I hold a B.A. in business economics and political science-international relations from the University of California, Los Angeles, where I graduated with honors.

4.      I have authored and co-authored numerous publications including "Use of Statistical Sampling in Litigation" and "Expert Analysis of Class Certification Issues," in both the 5th and 6th Editions of the Litigation Services Handbook.  In the 4th Edition of the Litigation Services Handbook, I coauthored a chapter titled "Economic Analysis of Reductions-in-Force and Pay Equity."

5.      A copy of my curriculum vitae summarizing my background and qualifications is attached as **Appendix A** to this report.

---

[1] Declaration of Lee M. Bowron, November 1, 2021 ("Bowron Report").

1

6.      Analysis Group is compensated at my hourly rate of $750 per hour for my time spent on this matter.  I have directed the work of other Analysis Group staff members with hourly billing rates ranging from $355 to $450.  Neither Analysis Group's nor my compensation is dependent on the outcome of this case.

### C.      Materials Relied Upon

7.      The materials I have relied upon in developing my opinions contained in this report are identified in this report and its attached exhibits and/or in **Appendix B**.  These materials include the Bowron Report and related responses to Counsel Questions, the Leaphart Declaration, and the reliance materials referenced in Mr. Leaphart's report, the Second Amended Complaint, and warranty claims data provided by AHM.[2]

## II.   Summary of Opinions

8.      Based on my analysis, I have reached the following conclusions.

- The Bowron Report's estimate for the Total Class Benefit of $10.557 million is overstated given its incorrect calculation of the loss fund estimate, and improper inclusion of a marketing fee.  When the correctly calculated loss fund estimate is used, and the improper marketing fee is removed, the corrected total class benefit using Mr. Bowron's methodology should be $1.376 million.  *See* **Table 3**.

- The Bowron Report's loss fund estimate of $4.072 million is overstated because it incorrectly assumes that Class vehicles may experience the same issue more than once, which is inconsistent with the Leaphart Declaration.  I discuss this in **Section V.A.**

- The Bowron Report's loss fund estimate also is overstated because the selected annual claim rate of ▮ percent is inflated for at least the following reasons:  (1) an annual claim rate of ▮ percent is inconsistent with the parties' joint expert's and

---

[2] Bowron Report; Lee M. Bowron Responses to Counsel Questions, November 6, 2021 ("Bowron Responses to Counsel Questions"); Declaration of Eldon G. Leaphart, November 3, 2021 ("Leaphart Declaration").

2

Plaintiffs' own technical expert's observed trends in the warranty data, which suggest a lower rate; and (2) Mr. Bowron's calculation of the annual claim rate incorporates an overstated estimated historical claims rate of ██ percent, which should be corrected to an adjusted rate of ██ percent based on the analysis conducted by the parties' joint expert, Mr. Eldon G. Leaphart.[3]  I discuss this in **Section V.B.**

- The Bowron Report incorrectly includes marketing fees in the value of the warranty extension.  It is my opinion that marketing fees are not an appropriate component of the value of the warranty extension to the proposed settlement Class Members, as proposed settlement Class Members are not purchasing an extended warranty on the open market at a retail price but are rather receiving a limited extension of an existing factory warranty.  I discuss this in **Section VI.**

9.    This summary is presented for the ease of the reader and should be read in the context of my full report.[4]

## III.  Background on the Acura RDX Infotainment System Warranty Extension

10.    As part of the settlement, proposed settlement Class Members will receive a two-year or 24,000 mile extension to their existing warranties for the conditions covered by two Acura technical service bulletins ("TSBs").[5]  The first is Acura TSB 20-031, "Popping/Crackling from the Speakers; Display Blank," which impacts the 2019 and 2020 Acura RDX models, and describes audio and display symptoms that occur as a result of an intermittent connection between Media Oriented Systems Transport ("MOST") and Electronic Control Unit ("ECU")

---

[3] While the Bowron Report uses the term "failure rate," I use the term "claim rate," as "claim rate" more accurately describes what is being quantified, which is the anticipated rate of future warranty claims under the warranty extension.

[4] Should additional information or data become available, I reserve the right to amend my report and related analyses.

[5] Leaphart Declaration, at ¶ 3.

components.[6]  The second is Acura TSB 20-001, "Center Display Unit Stays On with Ignition turned to OFF and Door Open," which only impacts the 2019 model year Acura RDX, and describes additional display symptoms, possibly the result of faulty software in the gauge control module (combination meter assembly).[7]  These two Acura TSBs were subsequently combined into Acura TSB 21-009.[8]  Joint Plaintiffs, Defense expert, Eldon G. Leaphart, found that claims consistent with TSBs 20-031 and 20-001 represent 21 percent of the total Infotainment warranty claims sampled between July 2020 and January 2021.[9]

### IV.  Summary of The Bowron Report's Estimated Retail Price Per Service Contract

11.  Based on a review of Acura TSBs 20-001 and 20-031, data provided by Class Counsel, articles on car buying negotiations, and Missouri and Oklahoma SERFF filings, the Bowron Report opined that the "point" estimate of an expected retail price for an extended two-year or 24,000 mile warranty covering future claims for symptoms associated with TSBs 20-001 and 20-031 is $83.43 per vehicle for a total value to the Class of $4.072 million.[10]

12.  The Bowron Report considered four components in its estimation of the retail price of the warranty extension: a loss fund, insurance expenses, administrative costs, and marketing fees.[11]  *See* **Table 1**.[12]

13.  **Loss Fund.**  The loss fund is the alleged expected cost of future warranty claims to Class Members over a six-year period when claims were assumed to occur, starting on the Bowron Report's projected settlement date of February 18, 2021.[13]  The Bowron Report calculates the loss fund as follows:

---

[6] Declaration of Eldon G. Leaphart, November 3, 2021, at ¶¶ 8, 9, 15; *See* also Acura Service Bulletin 20-031, "Popping/Crackling from the Speakers; Display Blank," June 18, 2020, at p. 1.

[7] Acura Service Bulletin 20-001, "Center Display Unit Stays On with Ignition Turned to OFF and Door Open," February 21, 2020, at p. 1.

[8] Acura Service Bulletin 21-009, "Warranty Extension: 2019-20 RDX MOST Bus Network Connectors," April 9, 2021, available at https://www.tsbsearch.com/Acura/21-009.

[9] Leaphart Declaration, at ¶ 16.

[10] Bowron Report, at ¶ 8.

[11] Mr. Bowron uses the terms Marketing Fees and Acquisition Costs interchangeably.  Specifically, in the text of his report, he uses the term Marketing Fees while, in Exhibit I, he uses the term Acquisition Costs.  *See* Bowron Report, at ¶ 9, Exhibit 1.

[12] Bowron Report, at ¶ 9.

[13] Bowron Report, at ¶¶ 9, 12.

4

- First, the number of potential "exposures" is determined in each year, based on assumptions about vehicle age, usage, and salvage rates.[14]

- Second, the number of potential exposures in each year is multiplied by the assumed annual claim rate, which Mr. Bowron refers to as the "failure rate."[15]

- Third, the annual cost is calculated as the projected number of Class vehicles with anticipated claims multiplied by a repair cost estimate.[16]

- Fourth, the loss fund is calculated as the sum of the cost estimates derived for years one through six.[17]

14.      **Insurance expenses and administrative costs.**  The Bowron Report then adds a premium equal to 15 percent of the expected loss costs for insurance expense[18] and $5.00 per full two-year extension for administrative costs.[19]

15.      **Marketing costs.**  The marketing fee is the alleged cost associated with selling a warranty extension.  The Bowron Report "selected" a marketing fee equivalent to 100% of the sum of the loss fund, the insurance expenses, and the administrative costs.[20]

16.      The "Total Class Benefit," or total retail value of the warranty extension, is calculated as the sum of the loss fund, insurance expense, administrative costs, and marketing fee.[21]  The Bowron Report estimates this amount to be $10.557 million and then estimates a high and a low estimate based on increasing and decreasing this amount by 20 percent.[22]

---

[14] The Bowron Report defines potential "exposures" as the number of Class vehicles, or the number of vehicles with the potential to be impacted by the symptoms covered by the warranty extension.  *See* Bowron Report, at ¶ 14.

[15] According to the Bowron Report, the assumed annual "failure rate" is the anticipated rate of future claims associated with the warranty extension.  *See* Bowron Report, at ¶ 19.

[16] The repair cost estimate is calculated as the sum of the retail price of parts required to service vehicles under the warranty extension and a labor cost estimate.  The labor cost estimate is based on the simple average of the hourly labor rates at six Acura dealerships surveyed in the following cities: Huntsville, AL, Thompsonville, PA, Anaheim, CA, Dallas, TX, Roseville, MI, and Denver, CO.  Bowron Report, at ¶ 20, Exhibit 2.

[17] Bowron Report, Exhibit 1.

[18] Bowron Report, at ¶ 23.

[19] Bowron Report, at ¶ 25; Exhibit 1.

[20] Bowron Report, at ¶¶ 9, 26.

[21] Bowron Report, Exhibit 1.

[22] Bowron Report, at ¶ 28; Exhibit 1.

5

## V. Corrections to The Bowron Report's Estimated Loss Fund

17.    The Bowron Report estimates a total loss fund of $4.072 million, as shown in **Table 1** below.[23]

**Table 1**
**Summary of The Bowron Report's Loss Estimate**

|  |  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Total |
|---|---|---|---|---|---|---|---|---|
| Exposures | [A] | 12,665 | 30,234 | 58,343 | 63,154 | 27,759 | 3,081 | **195,236** |
| Claim Rate | [B] | ■ | ■ | ■ | ■ | ■ | ■ | **■%** |
| Repair Cost | [C] | $259 | $267 | $275 | $283 | $292 | $300 | **$278** |
| Cost Estimate (000's) | [A]x[B]x[C] | $246 | $605 | $1,203 | $1,341 | $607 | $69 | **$4,072** |

18.    The Bowron Report's loss estimate is overstated for at least two reasons: (1) the exposure estimates are overstated; and (2) the annual claim rate of ■ percent is also overstated. Both of these issues are discussed in the section below.

### A.    The Bowron Report's Number of Exposures is Overstated Because It Incorrectly Assumes that Class Vehicles Can Experience the Same Issue More Than Once

19.    The Bowron Report calculates the number of exposures in each year and "each vehicle represents 2 exposures."[24]  He then applies the same claim rate to <u>both</u> years of extension.  Under Mr. Bowron's framework, a given vehicle has a ■ percent chance of experiencing an issue in the first year and another ■ percent chance of experiencing the same issue again in the second year.  This means that Mr. Bowron assumes it is possible for one vehicle to require a repair in both years of the warranty extension.[25]

20.    This assumption conflicts with the conclusion of the parties' joint expert, Mr. Leaphart who stated, "it is my opinion that Honda and the proposed settlement has effectively addressed customer issues related to the Infotainment Systems in the model year 2019 – 2020

---

[23] Bowron Report, Exhibit 1.

[24] Bowron Responses to Counsel Questions.

[25] The Bowron Report does not provide sufficient information to replicate the calculation of the number of annual Exposures estimated in Exhibit IV and Plaintiff's counsel did not produce Mr. Bowron's work papers until the business day before the filing of this report.  Therefore, my conclusions are based on the limited information disclosed in the Bowron Report.  It is possible there are other methodological problems with the calculations of annual Exposures that I am unaware and, therefore, will not address in this report.

6

Acura RDX Settlement Class Vehicles."[26]  In other words, once a vehicle is fixed, the same
problem will not reoccur.  Therefore, Mr. Bowron's exposure estimate should be adjusted so that
vehicles receive at most one repair consistent with the conclusions of Mr. Leaphart.

21.    To make this adjustment, I subtract from future exposures the number of vehicles
that have already had repairs—*i.e.*, for year two, all of the vehicles repaired in year one are
subtracted from year two; for later years, half of the vehicles repaired in the prior year are
subtracted because it is assumed that half of the vehicles fail in their first year of exposure and
the other half in their second year of exposure.  The half that failed in the second year would not
be in the exposure number for the subsequent year so they should not be deducted.[27]

22.    The adjusted number of exposures over the six-year period used in the Bowron
Report based upon these calculations is reflected in **Table 2.**

**B.    The Bowron Report's Selected Annual Claim Rate is Overstated
Because It Fails to Account for Observed Trends in Recent Warranty
Data and Appears to be Based on Data Analysis that Does Not Properly
Limit the Data to Relevant Warranty Claims**

23.    The Bowron Report applied an annual claim rate of ██ percent to determine the
Loss Estimate.[28]  However, the Bowron Report's selected ██ percent claim rate is inconsistent
with observed trends in recent warranty data, as discussed by the parties' joint expert, Eldon
Leaphart.  Furthermore, the Bowron Report's historical ██ percent claim rate is overstated
because it incorrectly includes claims on repairs that are not covered by the warranty extension.

*1.    The Bowron Report's Selected Annual Claim Rate is Inconsistent with Observed
Trends in Recent Warranty Data*

24.    The Bowron Report's annual claim rate of ██ percent is inconsistent with
observed trends in the warranty data.  Based on recent warranty data, between July 2020 and
January 2021, the Leaphart Declaration observed a decreasing trend of warranty claims from 250
claims per month in January 2020 to 100 claims per month by March 2020.[29]  While Mr.
Leaphart did not limit his analysis of warranty claims to the specific claims relevant to the
warranty extension, he notes that "it is reasonable that sufficient analysis would show claims

---

[26] Leaphart Declaration, at ¶23.
[27] *See* Table 2; Exhibit 2.
[28] Bowron Report, at ¶ 19.
[29] Leaphart Declaration, at ¶ 17.

specific to original Infotainment System components have fallen below this average during the period of July 2020 to January 2021."[30]  Given the expected downward trend in warranty claims, it is unreasonable for Mr. Bowron to apply a higher claim rate in the future (at █ percent) than his asserted historical claims rate of █ percent.[31]  The downward trend of claims suggests that the expected annual claim rate is lower than the historical claims rate of █ percent alleged in the Bowron Report.

25.     For purposes of the following discussion, I will assume that █% is the annual rate of warranty claims for all infotainment related problems for the Class vehicles.

*2.    The Bowron Report's Historical Claims Rate Incorrectly Includes Repairs that are Not Covered by the Warranty Extension*

26.     The Bowron Report's historical claims rate of █ percent is overly broad for purposes of valuing the extended warranty because it includes repairs for problems not covered by the warranty extension.  The proposed warranty extension specifically covers the two symptoms described in TSB 20-001 ("Center Display Unit Stays On with Ignition turned to OFF and Door Open") and TSB 20-031 ("Popping/Crackling from the Speakers; Display Blank").[32]  The Bowron Report does not identify the warranty data Mr. Bowron used in his calculation of his annual claim rate of █ percent.  However, the Bowron Report itself notes that "[t]he data also includes repairs for issues which are not included in the specific terms of this settlement's two years or 24,000 mile warranty extension."[33]  Indeed, the warranty data I received, which I understand was the same information provided to Mr. Bowron, contains claims for issues that are not covered by the scope of the proposed settlement, such as repairs for amplifiers or antennas.[34]  Below are three examples of claims for issues unrelated to the two TSBs.

a)    Claim Number 125640246: On August 14, 2020, a customer with a 2019 RDX claimed a repair for an issue with ████████████████████████ ████████████████████[35]

---

[30] Leaphart Declaration, at ¶ 17.

[31] Bowron Report, at ¶ 19.

[32] Acura Service Bulletin 20-001; Acura Service Bulletin 20-031.

[33] Bowron Report, at ¶ 7.

[34] "Warranty Data through July 2020 - HIGH CONF.xlsx," and "Updated Warranty Data 07.28.20-01.27.21 - HIGH CONF.xlsx."  *See* claims with values "AMPLIFIER, AUDIO" or "ANTENNA" under FAIL_SHORT_PARTNAME (Column H).

[35] "Updated Warranty Data 07.28.20-01.27.21 - HIGH CONF.xlsx," Claim number 125640246.

8

    b)  <u>Claim Number 127941642</u>: On December 8, 2020, a customer with a 2019 RDX claimed a repair for an issue with ████████████████████ ██████████████████████████████████ ██████████████ ,"[36]

    c)  <u>Claim Number 120743473</u>: On September 26, 2019, a customer with a 2019 RDX claimed a repair for an issue with ████████████████ ██████████████████████████[37]

    d)  <u>Claim Number 123718236</u>: On March 6, 2020, a customer with a 2019 RDX claimed a repair for a ████████████████████████ ██████████████████████████████████ ██████[38]

27.     I understand that the repairs in these examples are not covered by the scope of the warranty extension.

28.     Mr. Leaphart analyzed Infotainment warranty data from between July 2020 and January 2021 and found that warranty claims for "the TSB 20-001 and TSB 20-031 represented 21 percent of the warranty claims during this period of time."[39]  It is therefore reasonable to reduce the historical claims rate to 21 percent of the rate used in the Bowron Report ███ percent) since the rate in the Bowron Report is based on *all* infotainment-related warranty claims, regardless of whether they would be covered by the warranty extension.  To limit the annual claim rate to repairs covered by the warranty extension, I apply 21 percent to the Bowron Report's historical claim rate of ███ percent, which yields an annual claim rate of ███ percent.[40]

*** 

29.     Correcting the Bowron Report's methodology for the issues described in **Sections V and VI**, in part by limiting the annual claim rate to repairs covered by the warranty extension ███ percent), results in a total expected value of the loss fund of approximately $755,000.[41]  *See* **Table 2** below.

---

[36] "Updated Warranty Data 07.28.20-01.27.21 - HIGH CONF.xlsx," Claim number 127941642.

[37] "Warranty Data through July 2020 - HIGH CONF.xlsx," Claim number 120743473.

[38] "Warranty Data through July 2020 - HIGH CONF.xlsx," Claim number 123718236.

[39] Leaphart Declaration, at ¶ 16.

[40] *See* Exhibit 1.

[41] *See* Exhibit 1.

9

**Table 2**
**Adjustments to The Bowron Report's Loss Estimate[42]**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Total |
|---|---|---|---|---|---|---|---|---|
| **Limiting Annual Claim Rate to Repairs Covered by the Warranty Extension** | | | | | | | | |
| Exposures | [A] | 12,665 | 30,234 | 58,343 | 63,154 | 27,759 | 3,081 | **195,236** |
| Reduction in Exposure | [B]=[D]$_{t-1}$ / 2 | 0 | 177 | 211 | 407 | 439 | 191 | **1,426** |
| Adjusted Exposures | [C]=[A]-B | 12,665 | 30,057 | 58,132 | 62,747 | 27,320 | 2,890 | **193,810** |
| Adjusted Claim Rate | [D] | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| Expected Repairs | [E]=[C]x[D] | 177 | 421 | 814 | 879 | 383 | 40 | **2,715** |
| Repair Cost | [F] | $259 | $267 | $275 | $283 | $292 | $300 | **$278** |
| Adjusted Cost Estimate | [C]x[D]x[F] | $45,969 | $112,367 | $223,850 | $248,867 | $111,606 | $12,159 | **$754,818** |

## VI. The Bowron Report Incorrectly Includes Marketing Fees in the Value of the Warranty Extension, Even Though the Extension Will Not Require Any Additional Marketing Efforts

30.    The conclusion of the Bowron Report is Mr. Bowron's "best estimate of the suggested retail price for this extended warranty."[43]  This price is determined by summing the loss fund, the insurance expenses, the administrative costs, and the marketing fees.[44]  The marketing fees double the Bowron Report's claimed Class benefit.  It is my opinion that it is not appropriate to include the marketing fees as a "benefit" for the Class, however, because what should be valued is not the retail price of an extended warranty that Class Members would purchase on the open market, but rather the value of the limited warranty extension being given to Class Members at no cost to them.

31.    Unlike in a real marketplace where Class Members might contact different dealerships to understand the warranties they have available and the price of each before deciding to purchase an extended warranty, the proposed 2-year limited warranty extension is automatically given to proposed settlement Class Members on top of the factory warranties that already exist on all Class vehicles.  No additional marketing efforts are required to "sell" these limited warranty extensions to Class Members nor will the Defendant incur any marketing costs.  Therefore, the marketing fee premium included in the Bowron Report should be disregarded.

\*\*\*

---

[42] *See* Exhibits 1, 2.
[43] Bowron Report, at ¶ 34.
[44] Bowron Report, at ¶¶ 10 and 26.

10

32.    Including Mr. Bowron's estimates for the insurance expenses and the administrative costs increases the value estimate from approximately $755,000 after limiting the annual claims to repairs covered by the warranty extension (the ▮ percent) to approximately $1.376 million.[45]  *See* **Table 3** below.

**Table 3**
**Adjustments to The Bowron Report's Value Estimates[46]**

| Limiting Annual Claim Rate to Repairs Covered by the Warranty Extension | | |
|---|---|---|
| Total Adjusted Cost Estimate | [A] | $754,818 |
| Insurance Expenses | [B]=[A]/0.85-[A] | $133,203 |
| Administrative Costs | [C]=$5x97,618 | $488,090 |
| **Total Value** | **[D]=[A]+[B]+[C]** | **$1,376,111** |

Dated: November 15, 2021

_____
Mark Gustafson

---

[45] *See* Exhibit 2.

[46] *See* Exhibit 2.

11

**Exhibit 1**
**Adjustments to Bowron Report, Exhibit 3**
**Limiting Annual Claim Rate to Repairs Covered by the Warranty Extension**

| | | |
|---|---|---|
| Reported Claims | [A] | ■ |
| Estimated Sales through February 2020 | [B] | ■ |
| Estimated Average Sale Date | [C] | 5/31/2019 |
| Date of Data Provided by Honda | [D] | 2/28/2020 |
| Years Since Sale | [E] = [C] - [D] | 0.75 |
| | | |
| Estimated Annual Frequency | [F] = [A] / [B] / [E] | ■% |
| | | |
| Claims Consistent with TSBs 20-031 and 20-001 | [G] | 21% |
| | | |
| **Annual Claim Rate for Repairs Covered by the Warranty Extension** | **[H] = [F] x [G]** | ■% |

<u>Notes:</u>

[B] is obtained as the sum of vehicles sold between September 9, 2018 and February 14, 2020, instead of the total that Mr. Bowron provides in Exhibit III without providing his backup calculations.

[G] Mr. Leaphart found that claims consistent with TSBs 20-031 and 20-001 represent 21 percent of Infotainment warranty claims sampled between July 2020 and January 2021. (Leaphart Declaration, at ¶ 16.)

<u>Sources:</u>

Bowron Report, Exhibit 3; Bowron Report, Exhibit 4; Leaphart Declaration, at ¶ 16.

**Exhibit 2**
**Adjustments to Bowron Report, Exhibit 1**
**Limiting Annual Claim Rate to Repairs Covered by the Warranty Extension**

| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|---|---|---|
| Vehicles | [A] | ▮▮▮ | | | | | | |
| Full 2 Year Extensions | [B] = SUM([C]) / 2 | 97,618 | | | | | | |
| | | | | | | | | |
| Exposures | [C] | | 12,665 | 30,234 | 58,343 | 63,154 | 27,759 | 3,081 |
| Reduction in Exposure | [D] = [G]$_{t-1}$ / 2 | | 0 | 177 | 211 | 407 | 439 | 191 |
| Adjusted Exposures | [E] = [C] - [D] | | 12,665 | 30,057 | 58,132 | 62,747 | 27,320 | 2,890 |
| | | | | | | | | |
| Adjusted Claim Rate | [F] | | ▮▮ | ▮▮ | ▮▮ | ▮▮ | ▮▮ | ▮▮ |
| Expected Repairs | [G] = [E] x [F] | | 177 | 421 | 814 | 879 | 383 | 40 |
| | | | | | | | | |
| Repair Cost | [H] = [H]$_{t-1}$ x 1.03 | | $259 | $267 | $275 | $283 | $292 | $300 |
| Adjusted Cost Estimate | [I] = [G] x [H] | | $45,969 | $112,367 | $223,850 | $248,867 | $111,606 | $12,159 |
| | | | | | | | | |
| **Loss Estimate** | **[J] = SUM([I])** | **$754,818** | | | | | | |
| | | | | | | | | |
| Insurance Expenses | [K] = [J] / 0.85 - [J] | $133,203 | | | | | | |
| | | | | | | | | |
| Administrative Costs | [L] = $5 x [B] | $488,090 | | | | | | |
| | | | | | | | | |
| Adjusted Acquisition Costs | [N] | $0 | | | | | | |
| | | | | | | | | |
| **Total Class Benefit** | **[O] = [J] + [K] + [L]** | **$1,376,111** | | | | | | |

<u>Notes:</u>

[D] Mr. Leaphart found that Class Vehicles that receive repair services for the covered failure will not need a second repair. (Leaphart Declaration, at ¶ 23.) To account for this, I exclude vehicles that have already received repair services from the prior year. For year two, all of the vehicles repaired in year one are subtracted. For later years, half of the vehicles repaired in the prior year are subtracted because it is assumed that half of the vehicles fail in the first year and half in the second year. The half that failed in the second year would not be in the exposure number for the subsequent year so they should not be deducted.

[F] See Exhibit 1.

[N] See Expert Report of Mark Gustafson, Section VI.

<u>Sources:</u>

Bowron Report, Exhibit 1; Bowron Report, Exhibit 2; Leaphart Declaration, at ¶¶ 16, 23.

# Appendix A

**MARK A. GUSTAFSON**
**Principal**

Phone: 213 896-4563                                                        333 South Hope Street
Fax: 213 623-4112                                                          27th Floor
mark.gustafson@analysisgroup.com                          Los Angeles, CA 90071

Mr. Gustafson applies his expertise in economics, econometrics, and modeling to litigation, complex business issues, and the analysis of public policy issues. He has worked extensively in the areas of health care, insurance, employment, data privacy, ERISA, finance, intellectual property (IP), commercial damages, and class certification.

In his litigation work, Mr. Gustafson has provided deposition, arbitration, and trial testimony related physician compensation, the reasonable value of medical services, retirement benefits, employment compensation, lost earning capacity, and commercial damages, and he has critiqued plaintiffs' proposed damages formulas in several class actions. His case work has involved evaluating claims of excessive investment fees in corporate 401(k) defined-contribution plans, analyzing health insurance claims to identify instances of alleged fraud and inappropriate billing by hospital providers, and auditing risk-pool reconciliations that set the level of at-risk payments to a hospital group and its physician partners.

Mr. Gustafson has worked with clients to perform affirmative pay equity studies and to develop methodologies to address identified disparities. He has explored economic issues associated with a wide range of insurance products, including disability, health, life, product liability, and property insurance, as well as variable annuities. Mr. Gustafson also has experience in a variety of ERISA matters, including those related to health care plans, benefits, and insurance claims. Additionally, he has extensive experience assembling and analyzing large, proprietary datasets common in pay equity, insurance, and health care engagements. Prior to joining Analysis Group, Mr. Gustafson was the business manager in Tokyo for an international nonprofit. He also taught economics as a course assistant at Harvard University's Kennedy School of Government.

## EDUCATION

M.P.P.          Kennedy School of Government, Harvard University

B.A.            Business Economics and Political Science, University of California, Los Angeles

## PROFESSIONAL EXPERIENCE

2000–Present    Analysis Group, Los Angeles, CA and Boston, MA

1999–2000       Research Assistant, Harvard Institute for International Development, Harvard University, Cambridge, MA

1998–1999       Course Assistant, Kennedy School of Government, Harvard University, Cambridge, MA

# Appendix A

*Mark A. Gustafson, Page 2 of 15*

## DESIGNATIONS AND TESTIFYING EXPERIENCE

- ***Opal Labs, Inc. v. Sprinklr, Inc.*** (Case No. 3:18-01192-HZ, District of Oregon)
  Provided deposition and trial testimony on behalf of the defendant related to damages from an alleged theft of trade secrets and alleged intentional interference with Opal's business relationships.

- ***Lynne Houserman v. Comtech Telecommunications Corporation et al.*** (Case No. 19-cv-00644, W.D. Wash.)
  Provided deposition testimony on behalf of the plaintiff related to her claims for breach of contract and wrongful termination.

- ***HayDX v. Lyndon Ichida; HayDay Farms, Inc.*** (Case No. PSC1800056)
  Provided deposition and trial testimony regarding the value of farm machinery and improvements.

- ***Dr. Mehmet Pekerol and Medmet Pekerol MC, APC v. Christina Anakor; Kindred Healthcare Operating, Inc.; KND 53, LLC and KND Development 53, LLC*** (Case No. BC596704)
  Provided deposition testimony regarding plaintiff's alleged lost practice revenue.

- ***CFHS Holdings, Inc. dba Marina Del Rey Hospital v. HealthCare Partners Affiliates Medical Group and DaVita Medical Group Associates California, Inc.*** (Case No. BC696335)
  Provided deposition testimony regarding the reasonable value of out-of-network emergency department services.

- ***Pomona Valley Hospital Medical Center v. Kaiser Foundation***
  Submitted declaration related to common claims processing systems among hospital providers.

- ***HayDay Farms, Inc. v. FeeDx Holdings, Inc.; Thomas Tsai; HayDx, Inc.; and FFNT*** (AAA arbitration)
  Provided arbitration testimony in phase one of the arbitration regarding sales activities of the parties and in phase two regarding damages.

- ***Israel Perez v. The United States of America*** (Case no. 16CV1911 JAH MDD)
  Provided trial and deposition testimony on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- ***California Spine and Neurosurgery Institute v. Blue Shield of California*** (Case No. SC128665)
  Submitted declaration on behalf of the defendant regarding the reasonable value of disputed services.

- ***California Spine and Neurosurgery Institute v. Blue Shield of California*** (Case No. SC127959)
  Submitted declaration on behalf of the defendant regarding the proper adjudication of the disputed claims.

- ***Adelphia, Inc. dba Village Auto, Dan's One Stop Shop, LLC and Element Garage, LLC, et al. v. Heritage Crystal Clean*** (Case No. 15-L-386 consolidated with 15-L426 and 15-L541)
  Provided deposition testimony critiquing the plaintiffs' expert's damages model.

- ***Shakespeare, et al. v. Adventist Health Systems/West*** (Case no. SCV00035863)
  Provided trial testimony related to the plaintiffs' alleged loss of income from the expiration of an emergency department call contract and the reduction in the plaintiffs' surgical block time at the defendant hospital.

# Appendix A

*Mark A. Gustafson, Page 3 of 15*

- **Roger McCullar v. The United States of America** (Case no. 2:16-cv-01174-TLN-CKD)
  Submitted expert report on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- **ADT LLC and ADT US Holdings v. Vivint, Inc.** (Case no. 9:14-cv-80432-DMM)
  Submitted rebuttal expert report and provided deposition testimony responding to the plaintiffs' damages experts.

- **Jaxon Nichols v. The United States of America** (Case no. 16CV1584 GPC WVG)
  Submitted expert report on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- **Gastelum and Bryden, et al. v. Verizon California, Inc.** (Case no. CGC-11-511467)
  Prepared declaration analyzing Verizon California's collection costs associated with the failure of the putative class members to make timely payment.

- **Timothy Gendreau, et al. v. California Physicians' Service, D.B.A Blue Shield of California**
  Submitted declaration on behalf of Blue Shield regarding whether Blue Shield properly calculated deductible and out-of-pocket maximums for Mr. Gendreau, and whether prescription benefits were properly paid.

- **Susan Chan DDS v. DeltaDental**
  Submitted rebuttal expert report and provided deposition testimony on behalf of DeltaDental related to Dr. Chan's allegation that DeltaDental failed to properly administer its patient referral program, causing Dr. Chan to lose business.

- **Duncan Roy, et al. v. County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County**
  Submitted rebuttal expert report on behalf of the County of Los Angeles analyzing the plaintiff's expert's calculation of the number of people in each putative class and of the alleged frequency of over-detentions related to enforcements of immigration detainers.

- **Hunters Run Apartments, LTD., et al. v. WCA Waste Corporation, et al.**
  Submitted rebuttal expert report and provided deposition testimony on behalf of the defendant evaluating the plaintiffs' expert's report opining on damages and the availability of required data.

- **Alexis Gurshin v. Bank of America Corporation**
  Submitted expert report on behalf of Bank of America analyzing the plaintiff's damages claim.

- **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC**
  Submitted rebuttal expert report on behalf of the defendant analyzing the plaintiff's expert's damages claims and providing an alternative damages analysis related to the plaintiff's alleged wrongful termination.

- **Stevenson v. The Bank of New York**
  Provided deposition and trial testimony related to retirement benefits and employment compensation due to the plaintiff resulting from the bank's alleged failure to continue to accrue retirement benefits while the plaintiff was seconded to an affiliated bank, and the alleged failure to reemploy the plaintiff following the end of his service with the affiliated bank.

- **Guillory, et al v. County of Los Angeles**
  Submitted declaration analyzing the plaintiffs' class-wide damages due to alleged improper administration of the county's general relief welfare program.

# Appendix A

*Mark A. Gustafson, Page 4 of 15*

- **Prime Healthcare Cases**
  Submitted declaration related to the defendant's identification and analysis of the plaintiff's disputed hospital claims.

- **In re: Urethane Antitrust Litigation**
  Submitted three declarations analyzing the plaintiffs' expert's damages model to demonstrate that portions of the class either had zero or negative damages.

- **Willingham v. Life Partners, Inc.**
  Authored rebuttal report analyzing the plaintiff's proposed class-wide damages model submitted in support of certification for a putative class of investors in life settlements.

- **Kaiser v. Vanguard**
  Designated to analyze health care claims data used by a statistical expert to estimate damages in a payer/provider dispute.

## SELECTED CASE ASSIGNMENTS

### Class Certification

- **IntegrityMessageBoards v. Facebook** (October 2020–August 2021)
  Supported an economist with expertise in marketing and digital advertising and a technical expert on behalf of Facebook. The economist provided background on digital advertising and the numerous technologies available to different actors as well as critiqued the damage model put forward by the plaintiff's expert. The technical expert analyzed the data available in the case to assess whether the proposed damages model could be implemented. The court did not certify the class.

- **In re: FCA US LLC Monostable Electronic Gearshift Litigation** (July 2018–December 2019)
  Supported two experts in the litigation. The first evaluated the plaintiffs' proposed conjoint analysis and assessed whether the proposed analysis would accomplish the purpose for which it was designed. The second critiqued the plaintiffs' expert's damages model and analyzed issues relevant to class certification.

- **In re: Yahoo! Inc. Customer Data Security Breach Litigation** (February 2018–September 2018)
  Supported an expert evaluating consumer preferences and habits related to the sharing of private information, and critiquing plaintiffs' expert's damages model.

- **Adelphia, Inc. dba Village Auto, Dan's One Stop Shop, LLC and Element Garage, LLC, et al. v. Heritage Crystal Clean** (April 2017–April 2018)
  Provided deposition testimony critiquing the plaintiffs' expert's damages model in this class action related to fuel surcharges.

- **Glenn, et al. v. Hyundai Motor Co. et al.** (April 2017–March 2018)
  Supported one expert addressing the plaintiffs' proposed damages methodology and another evaluating the plaintiffs' experts proposed conjoint analysis in this class action related to panoramic sunroof fractures.

- **Kondash v. Kia Motors America, Inc., et al.** (April 2017–March 2020)
  Supported one expert addressing the plaintiff's proposed damages methodology and another evaluating the plaintiff's expert's proposed conjoint analysis in this class action related to panoramic sunroof fractures.

# Appendix A

*Mark A. Gustafson, Page 5 of 15*

- **Gastelum and Bryden, et al. v. Verizon California, Inc.** (October 2012–June 2018)
  Prepared declaration analyzing Verizon California's collection costs associated with the failure of the putative class members to make timely payment.

- **Looper, et al. v. FCA US LLC, f/k/a Chrysler Group LLC** (July 2016–November 2016)
  Supported an expert analyzing the plaintiff's proposed method for proving class-wide damages.

- **Duncan Roy, et al. v. County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County**
  Submitted rebuttal expert report on behalf of the County of Los Angeles analyzing the plaintiff's expert's calculation of the number of people in each putative class and of the alleged frequency of over-detentions related to enforcements of immigration detainers.

- **Hunters Run Apartments, LTD., et al. v. WCA Waste Corporation, et al.**
  Submitted rebuttal expert report and provided deposition testimony on behalf of the defendant evaluating the plaintiffs' expert's report opining on damages and the availability of required data.

- **Elkind and Rose, et al. v. Revlon Consumer Products Corporation** (October 2015–June 2016)
  Supported expert rebutting the plaintiff's claim that Revlon's use of the term DNA Advantage was false and misleading.

- **Yaeger, et al. v. Subaru of America, Inc. and Fuji Heavy Industries, Ltd.** (September 2014–June 2015)
  Estimated exposure in support of settlement negotiations related to claims of excess oil consumption for certain Subaru vehicles.

- **Coba, et al. v. Ford Motor Company** (May 2014–August 2017)
  Analyzed the plaintiff's claim of excess depreciation related to F-series and E-series Ford vehicles because of fuel tank delamination.

- **Guillory, et al. v. County of Los Angeles** (June 2013–October 2014)
  Submitted declaration analyzing the plaintiffs' class-wide damages due to alleged improper administration of the county's general relief welfare program.

- **Margie Daniel, et al. v. Ford Motor Company** (November 2012–January 2018)
  Estimated excess depreciation experienced by owners of the Ford Focus resulting from an allegedly defective suspension system, and evaluated claims of premature tire wear.

- **Zakskorn, et al. v. American Honda Motor Co. Inc.** (July 2012–February 2013)
  Estimated excess depreciation experienced by owners of accused Honda vehicles resulting from an allegedly defective braking system.

- **Charlotte Phillips, et al. v. WellPoint Inc.** (August 2011–March 2012)
  Supported an expert rebutting the plaintiff's proposed damages model related to RightCHOICE's withdrawal from the Illinois insurance market.

- **Karen Herbert, et al. v. Endemol USA, Inc.** (June 2011)
  Estimated the response rate for a proposed class action settlement.

- **Diaz v. First American Home Buyers Protection Corp.** (November 2010–July 2011)
  Supported an expert rebutting the plaintiff's proposed damages model related to First American's alleged failure to honor its home warranties.

# Appendix A

*Mark A. Gustafson, Page 6 of 15*

- **Multiple Class Actions v. KIA Motors America, Inc.** (March 2005–July 2005)
  Estimated excess depreciation experienced by owners of the Kia Sephia resulting from an allegedly defective braking system.

- **Class Actions v. Monsanto Co., et al.** (2002)
  Analyzed the level of heterogeneity between members of a proposed class in a price-fixing case.

## Insurance

- **WML Gryphon Fund, LLC v. Woo, Hat & Silver, LLC, et al.** (February 2020–September 2021)
  Supported rebuttal expert witness on behalf of certain insurance company defendants addressing economic issues related to liability and damages as well as providing an understanding of the economics of life settlements and how they differ from STOLIs.

- **In Re: AXA Equitable Life Insurance Company COI Litigation.** (July 2018–October 2019)
  Supported rebuttal report analyzing issues related to class certification and damages related to allegations that a COI increase for universal life insurance policies was inappropriate.

- **Willingham v. Life Partners, Inc.** (July 2012–February 2014)
  Authored rebuttal report analyzing the plaintiff's proposed class-wide damages model submitted in support of certification.

- **Redwood Health Services v. Anthem Blue Cross Life and Health Insurance Company** (November 2012–February 2013)
  Critiqued the plaintiff's lost profits damages model resulting from Anthem's allegedly improper termination of a high-deductible insurance product and its prohibition of wrapping in the mid-sized group market.

- **Best Buy Co., Inc. v. Developers Diversified Realty** (November 2006–July 2010)
  Supported a testifying expert in an analysis of insurance costs applicable to common areas of retail developments.

- **Confidential Insurance Remediation** (March 2005–January 2010)
  Consulted with international insurance company related to remediation of alleged failure to annuitize variable annuity products according to the contract.

- **Barnes & Noble v. DDR** (May 2005–April 2006)
  Supported a testifying expert in an analysis of insurance costs applicable to common areas of retail developments.

- **Confidential Asbestos Litigation** (September 2001–June 2003)
  Consulted with a large property insurance company to assist them in determining their potential asbestos exposure to support arbitration negotiations with asbestos manufacturers. Designed and implemented a detailed review of over 500 individual asbestos case files.

- **Confidential Regulatory Investigation** (August 2001–May 2003)
  Worked with an insurance company and outside actuaries to quantify the number of affected policies and financial implications of an alleged violation of IRS rules related to whole life insurance products. Aggregated data for both active and legacy systems containing over 80 million records.

- **Class Action v. Knights of Columbus** (January 2001–June 2004)
  Assisted an economic expert for the Knights of Columbus in a major sales practices litigation

# Appendix A

involving over 500,000 policyholders. Estimated the damages to policyholders under alternative
theories of liability, including development of computer-based policy performance models.

- **Confidential Disability Insurance Sales Practices Litigation** (September 2000–December 2002)
  Supported a consulting expert on issues related to the sale and product performance of individual
  disability insurance policies. Designed and implemented a large data abstracting effort involving
  almost 1.5 million claim and policy records and 17 million accounting records for the insurance
  company defendant, and assisted in the development of a settlement for tens of thousands of
  policyholders.

<u>Health Care</u> (litigation and non-litigation assignments)

- ***Thomas Harold MacRae; Francisca Dennin; and Tomasita Hoffmann vs. HCR Manor Care
  Services, LLC; Manor Care of Citrus Heights CA, LLC; Manor Care of Fountain Valley CA, LLC;
  and Manor Care of Hemit CA, LLC*** (July 2019 to August 2019)
  Submitted expert report analyzing staffing levels at the Manor Care facilities, comparing staffing
  levels to comparable facilities, and evaluating whether plaintiffs' proposed damage model

- ***Dr. Mehmet Pekerol and Medmet Pekerol MC, APC v. Christina Anakor; Kindred Healthcare
  Operating, Inc.; KND 53, LLCand KND Development 53, LLC*** (April 2019 to date)
  Provided deposition testimony regarding plaintiff's alleged lost practice revenue.

- ***CFHS Holdings, Inc. dba Marina Del Rey Hospital v. HealthCare Partners Affiliates Medical
  Group and DaVita Medical Group Associates California, Inc.*** (May 2019–June 2019)
  Provided deposition testimony regarding the reasonable value of out-of-network emergency
  department services.

- ***Pomona Valley Hospital Medical Center v. Kaiser Foundation*** (September 2018)
  Submitted declaration related to common claims processing systems among hospital providers.

- ***El Camino Hospital v. Kaiser Foundation Health Plan, Inc.*** (June 2018–November 2019)
  Supported an expert on behalf of the defendants benchmarking the defendants' payment levels for the
  disputed services to market rates.

- ***Doctors Hospital of Manteca, et al. v. Kaiser Foundation Health Plan Inc. and Kaiser Foundation
  Hospitals*** (January 201–February 2020)
  Supported an expert on behalf of the defendants benchmarking the defendants' payment levels for the
  disputed services to market rates, and responded to the plaintiff's expert's opinion.

- ***NorthBay Healthcare Group – Hospital Division dba NorthBay Medical Center and VacaValley
  Hospital v. Blue Shield of California*** (January 2018–November 2018)
  Supported two experts on behalf of Blue Shield of California. The first expert evaluated the
  reasonable value of the disputed services and responded to the plaintiff's expert's opinion. The second
  expert evaluated the quality of the plaintiff hospitals relative to comparable hospitals.

- ***California Spine and Neurosurgery Institute v. Blue Shield of California*** (October 2018)
  Submitted declaration on behalf of the defendant regarding the reasonable value of the disputed
  services.

- ***California Spine and Neurosurgery Institute v. Blue Shield of California*** (July 2018–October 2018)
  Submitted declaration on behalf of the defendant regarding the proper adjudication of the disputed
  claims.

# Appendix A

- ***San Jose Neurospine v. Kaiser Foundation Health Plan, Inc.*** (January 2018–July 2018)
  Analyzed the reasonable value of out-of-network emergency services.

- ***San Jose Neurospine v. California Physicians' Service, dba Blue Shield of California*** (November 2016–August 2018)
  Supported two experts for Blue Shield of California related to the reasonable value of the medical services provided and the appropriateness of the services billed. The jury returned a verdict for the defense.

- ***Shakespeare, et al. v. Adventist Health Systems/West*** (March 2017–November 2017)
  Provided trial testimony related to the plaintiffs' alleged loss of income from the expiration of an emergency department call contract and the reduction in the plaintiffs' surgical block time at the defendant hospital.

- ***Timothy Gendreau, et al. v. California Physicians' Service, dba Blue Shield of California*** (October 2016–July 2017)
  Submitted declaration on behalf of Blue Shield regarding whether Blue Shield properly calculated deductible and out-of-pocket maximums for Mr. Gendreau, and whether prescription benefits were properly paid.

- ***Bodner and Felker, et al. v. Blue Shield of California Life and Health Insurance Company*** (October 2015–April 2020)
  Supported multiple experts addressing issues of class certification, damages, and the availability of policies with certain plan designs during the period 2008–2012.

- **Prime Healthcare Cases** (November 2008–February 2018)
  Submitted declaration related to the defendant's identification and analysis of the plaintiff's disputed hospital claims.

- **Washington State Hospital Association** (July 2011 to date)
  Consulted with the Washington State Hospital Association related to the Hospital Safety Net Assessment.

- ***Allegheny General Hospital v. UPMC Health Plan*** (April 2009–December 2010)
  Supported a damages expert in payer/provider dispute brought under Pennsylvania's Act 68.

- ***Accountable Health Care IPA and Accountable Health Care MSO v. Memorial Hospital of Gardena, et al.*** (December 2012–March 2013)
  Supported an expert in replicating risk pool reconciliations that were the basis for at-risk payments to Accountable Health Care IPA and Memorial Hospital of Gardena.

- ***Premera Blue Cross v. MultiCare Health System*** (September 2012–December 2012)
  Estimated actual change in reimbursements to MultiCare Health System following an allegedly revenue-neutral transition to an APC payment methodology.

- ***CareCentrix v. Apria Healthcare Group*** (June 2012–September 2012)
  Supported an expert in benchmarking the rate of increase in Apria's billed charges for particular services against rates of increases for similar services offered by other providers.

- ***Jane Kakkis, M.D. v. Breastlink Medical Group, Inc.*** (January 2011–May 2011)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

# Appendix A

- ***Ned-Sthran v. Methodist Hospitals of Dallas, et al.*** (January 2009–April 2009)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

- **Confidential White Paper** (April 2008–October 2008)
  Assisted academic affiliate in drafting white paper on the level of competition in a specific hospital market to assist hospital in obtaining a certificate of need from state regulators.

- ***Kimberly Gandy-Quinn vs. Blue Shield of California, et al.*** (May 2008–June 2008)
  ***Twilla and Martin Willey vs. Blue Shield of California, et al.*** (May 2008–June 2008)
  Supported three defense experts opining on damages, National Committee for Quality Assurance standards, and the appropriateness of capitation, respectively. Both cases resulted in favorable settlements for Blue Shield.

- **Confidential Pharmaceutical Engagement** (September 2007)
  Estimated the impact of possible regulatory changes on the profitability of a large pharmaceutical company for use in its long-range planning.

- **Confidential White Paper** (April 2006–April 2007)
  Estimated the extent to which underpayment of Medicaid claims affects the cost of commercial insurance in California, and the subsequent number of people who are therefore unable to afford coverage.

- ***Thu-Hang Tran, Pharm.D., et al. vs. Orange County Health Authority, et al.*** (2006)
  ***Guy Nguyen, R.Ph., et al. vs. Orange County Health Authority, et al.*** (2006)
  Consulted on alleged damages resulting from the temporary suspension of plaintiff pharmacies from Cal-Optima's Medi-Cal drug reimbursement program.

- ***John Muir Medical Center v. Health Net, Inc.*** (July 2005–May 2006)
  Evaluated whether inflation in hospital charges exceeded the amount allowed in a provider services contract.

- ***US Department of Justice v. Tenet Healthcare Corporation*** (July 2003–January 2005)
  Assisted the Department of Justice (DOJ) in investigating billing irregularities by select Tenet hospitals. Implemented sampling plan developed by a sampling expert to determine the rate of billing errors from a random sample of hospital detailed bills. Managed audit of selected detailed bills. Tenet settled with the DOJ for more than $900 million.

- ***In re: Managed Care Litigation*** (August 2003–January 2005)
  Supported health insurance company in litigation involving allegations of improper claim adjudication and late payments. Analyzed over 500 million records for more than 100 million unique claims.

- **Drug Cost Effectiveness Paper** (February 2001–September 2001)
  Drafted paper on the cost effectiveness of rHu-EPO in the treatment of anemia.

- **Drug Study of rHu-EPO** (January 2001–September 2001)
  Analyzed results of drug study to assess the effectiveness of rHu-EPO to alleviate anemia.

## Commercial Damages

- ***CPI v. Vivint, Inc.*** (June 2021 to date)
  Submitted rebuttal expert report responding to the plaintiffs' damages experts.

# Appendix A

*Mark A. Gustafson, Page 10 of 15*

- ***ADT LLC and ADT US Holdings v. Vivint, Inc.*** (August 2021 to date)
  Submitted rebuttal expert report responding to the plaintiffs' damages experts.

- ***HayDX v. Lyndon Ichida; HayDay Farms, Inc.*** (January 2020)
  Provided deposition and trial testimony regarding the value of farm machinery and improvements.

- ***HayDay Farms, Inc. v. FeeDx Holdings, Inc.; Thomas Tsai; HayDx, Inc.; and FFNT*** (May 2019–June 2019)
  Provided arbitration testimony regarding sales activities of the parties.

- ***ADT LLC and ADT US Holdings v. Vivint, Inc.*** (June 2017–February 2018)
  Submitted rebuttal expert report and provided deposition testimony responding to the plaintiffs' damages experts.

- ***Franchisee Lawsuits/Arbitrations v. United Parcel Service, et al.*** (July 2006–January 2008)
  Investigated the reasons and information analyzed to support the decision to rebrand Mail Box Etc. as The UPS Store.

- ***Caruso Affiliated Holdings, LLC v. General Growth Properties, Inc. and GGP/Homart II, LLC*** (November 2005–November 2007)
  Analyzed the plaintiffs' damages claim for construction delay and lost income damages resulting from the alleged delay in construction of the Americana At Brand due to alleged misconduct by General Growth Properties, Inc. and GGP/Homart II, LLC.

- ***Sargon Enterprises Inc., v. University of Southern California, et al.*** (January 2007–August 2007)
  Analyzed the plaintiffs' damages claim for lost profits in the dental implant business stemming from the defendants' failure to properly conduct a clinical trial.

- ***Take It Away, Inc. v. Home Depot, Inc.*** (October 2006–January 2007)
  Reviewed and critiqued plaintiff's business model and profit forecasts that formed the basis of its damage claim.

- ***Eldorado Stone, LLC and Eldorado Stone Operation, LLC v. Renaissance Stone, Inc., et al.*** (August 2006–July 2007)
  Assisted expert in rebutting the plaintiff's statistical expert's testimony related to the probability that the defendant could have obtained certain stone colors by random chance.

- ***Vought Aircraft Industries, Inc. v. Gulfstream Aerospace Corp.*** (March 2006–June 2006)
  Estimated the value of redesigning the manufacturing process for Gulfstream jets and the effect on the sale of Gulfstream jets.

# Appendix A

*Mark A. Gustafson, Page 11 of 15*

## Intellectual Property

- **Opal Labs, Inc. v. Sprinklr, Inc.** (April 2019 to date)
  Provided deposition and trial testimony on behalf of the defendant related to damages from an alleged theft of trade secrets and alleged intentional interference with Opal's business relationships.

- **Confidential Cross-License Negotiation** (February 2015–June 2016)
  Assisted an international company in license negotiations with its main competitor related to a cross-license. Work included estimating royalty and lost profit exposure for both firms under different liability and infringement assumptions.

- **Confidential Cross-License Arbitration** (March 2013–May 2015)
  Assisted an international company in an arbitration to set the appropriate FRAND rate for a cross-license between it and another large market participant.

- ***TracBeam LLC v. Google, Inc.*** (May 2013–May 2014)
  Supported an expert analyzing Google's alleged use of TracBeam's device location identification patent.

- ***Capital Funding Group Inc. v. Walker & Dunlop LLC*** (November 2010–June 2012)
  Supported an expert analyzing the defendant's use of Capital Funding Group's proprietary information.

- ***Grunstein, et al. v. Silva, et al.*** (September 2012–January 2013)
  Supported an expert analyzing the defendant's use of the plaintiff's proprietary information.

- ***Konami Digital Entertainment, Inc. and Konami Corporation v. Vintage Sports Cards Inc; The Upper Deck Company, a California Corporation; and The Upper Deck Company, a Nevada Corporation*** (July 2009–March 2010)
  Calculated lost profit and disgorgement damages resulting from counterfeiting of Yu-Gi-Oh! trading card game cards by Upper Deck.

- ***L-3 Communications Integrated Systems v. Lockheed Martin Corporation*** (2008–2011)
  Reviewed and rebutted the plaintiff's damages claim stemming from L-3's claim that Lockheed Martin violated the Sherman Act in claiming that only Lockheed Martin had the rights to perform refurbishment services for P-3 "Orion" military aircraft for foreign powers. The analysis included examining the impact of Lockheed Martin's alleged actions on L-3's sales related to both loss of current revenue streams and future customers, and evaluating the damages estimates submitted by L-3 Communications Integrated Systems' expert.

- ***Candela Corporation v. Palomar Medical Technologies, Inc.*** (December 2007–September 2008)
  Estimated lost profits and reasonable royalty for the wrinkle reduction feature of medical lasers.

- ***AllCare Health Management System Inc. v. Highmark, Inc.*** (December 2007–September 2008)
  Estimated reasonable royalty for a system allowing computerized adjudication and payment of physician claims.

- ***Dial Industries, Inc. v. Lipper International, Inc.*** (May 2006–October 2006)
  Estimated reasonable royalty for the expandable feature of expandable drawer organizers.

- ***Altnet, Inc., et al. vs. Recording Industry Association of America, et al.*** (March 2006–April 2006)
  Estimated reasonable royalty for an internet file sharing protocol.

# Appendix A

*Mark A. Gustafson, Page 12 of 15*

- **Rent Information Technology v. The Home Depot** (January 2006–May 2006)
  Analyzed issues related to damages for alleged theft of trade secret.

- **Israeli Bio-Engineering Project v. Amgen** (June 2005–December 2005)
  Determined reasonable royalty for Amgen's alleged infringement of Israeli Bio-Engineering Project's patent related to tumor necrosis factor binding protein II. Supported rebuttal of the opponent's damages expert.

- **Confidential Patent Infringement Litigation** (September 2005–November 2005)
  Analyzed issues related to reasonable royalty for alleged infringement of patent covering traffic cones.

- **Confidential Patent Infringement Litigation** (June 2005–September 2005)
  Analyzed issues related to alleged infringement of patent in the biotechnology field. Assisted counsel in successful settlement negotiations.

- **Confidential Negotiations** (April 2005–May 2005)
  Estimated reasonable royalty for patent related to internet dating to support client in negotiation with the alleged infringer.

- **Shell & Slate Software v. Adobe Systems** (November 2003–December 2004)
  Calculated disgorgement of profits and reasonable royalty for alleged theft of trade secrets concerning digital photo manipulation.

## Employment / Lost Earning Capacity

- **Lynne Houserman v. Comtech Telecommunications Corporation et al.** (June 2020 to date)
  Provided deposition testimony on behalf of the plaintiff related to her claims for breach of contract and wrongful termination.

- **Israel Perez v. The United States of America** (August 2016–December 2018)
  Provided trial and deposition testimony on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- **Roger McCullar v. The United States of America** (June 2016–April 2018)
  Submitted expert report on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- **Jaxon Nichols v. The United States of America** (August 2016– August 2017)
  Submitted expert report on the plaintiff's lost earning capacity and the appropriate discount rate for the plaintiff's life care plan.

- **Susan Chan DDS v. DeltaDental** (August 2016–October 2016)
  Submitted rebuttal expert report and provided deposition testimony on behalf of DeltaDental related to Dr. Chan's allegation that DeltaDental failed to properly administer its patient referral program, causing Dr. Chan to lose business.

- **Alexis Gurshin v. Bank of America Corporation** (September 2015–March 2018)
  Submitted expert report on behalf of Bank of America analyzing the plaintiff's damages claim.

- **Rosario J. Lopez v. PVH Neckwear, Inc., et al.** (February 2016–March 2016)
  Estimated damages and potential exposure related to claim of pregnancy discrimination and wrongful termination.

# Appendix A

*Mark A. Gustafson, Page 13 of 15*

- **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC** (March 2015–July 2016)
  Submitted expert report on behalf of the defendant analyzing the plaintiff's expert's damages claims and providing an alternative damages analysis related to the plaintiff's alleged wrongful termination.

- **Stevenson v. The Bank of New York** (August 2011–January 2013)
  Provided deposition and trial testimony related to retirement benefits and employment compensation due to the plaintiff.

- **Nancy Sweet v. United Parcel Service** (July 2010)
  Analyzed time records to determine whether the FLSA Motor Carrier Exemption applied in these wage-and-hour matters.

- **Confidential Criminal Investigation** (May 2006–June 2006)
  Investigated claims by the United States of illegal employment practices during a lockout.

- **Confidential Wrongful Termination Litigation** (June 2005)
  Investigated lost earnings damages related to an alleged wrongful termination of an employee and damages related to an alleged breach of contract and fiduciary duty.

- **Class Action v. McDonnell Douglas** (January 2003)
  Assisted in estimation of individual damages to approximately 1,100 terminated class members.

- **Confidential Executive Compensation Litigation** (2001)
  Estimated the value of a Parisian employee stock option using Monte Carlo simulation to evaluate the claim that executive compensation post-merger violated a pre-merger employment agreement.

- **Confidential Corporate Reorganization** (2001)
  Analyzed the impact of a reduction in force on protected classes in the utility industry.

## Valuation

- **Marshall Hospital v. Eliot R. Drell, M.D., et al.** (July 2006–December 2006)
  Valued a single-specialty, gastroenterology ambulatory surgery center for an arbitration between the general and limited partners.

- **Peter Vagenas vs. Demeterios Kefallinos, et al.** (September 2006–December 2006)
  Valued a two-location hamburger restaurant for a lawsuit between business partners.

## Securities/Finance

- **City of Burlington, VT v. Morgan Stanley** (February 2011–March 2011)
  Supported an expert who evaluated whether Morgan Stanley execution costs were excessive and rebutted the plaintiffs' damages claim.

- **Robin E. Figas v. Wells Fargo & Company, et al.** (August 2010–March 2011)
  Supported an expert who evaluated allegations that the fees for certain investment options available in the Wells Fargo 401(k) plan were excessive and rebutted the plaintiffs' damages claim.

- **David v. Alphin** (January 2010–August 2010)
  Supported an expert who evaluated allegations that the fees for certain investment options available in the Bank of America 401(k) plan were excessive and rebutted the plaintiffs' damages claim.

# Appendix A

*Mark A. Gustafson, Page 14 of 15*

- ***Compudyne Corp., et al. vs. Hilary L. Shane, et al.*** (May 2006–November 2006)
  Investigated the defendant's profit from short selling in advance of a private investment in public equity (PIPE) placement.

- ***Securities & Exchange Commission v. Henry Yuen, et al.*** (November 2004–December 2005)
  Provided consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- ***Internet Law Library v. Southbridge Capital, LLC*** (February 2003–May 2006)
  Investigated claims of alleged stock price manipulation by a hedge fund.

### Government / Public Policy

- **City of Los Angeles** (January 2006–July 2006)
  Analyzed factors influencing post-stop sanctions by the Los Angeles Police Department to determine if observed officer behavior was consistent with racial profiling.

- **California State Auditor** (October 2003–February 2004)
  Consulted with the California State Auditor's office to support their review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Review of California Proposition 79** (September 2005)
  Analyzed the impact of Proposition 79 on the California economy and coauthored final report.

- **Economic Impact of Federal Participation in Terrorism Risk** (May 2004–September 2004)
  Contributed to a study with Professor Glenn Hubbard, former chair of the Council of Economic Advisers. Study focused on the economic impact of the federal Terrorism Risk Insurance Act (TRIA) and the economic impact of failing to renew the legislation. Study commissioned by numerous insurance trade organizations.

### Utilities

- **Federal Energy Regulatory Commission Assistance** (October 2003)
  Simulated the California electricity generation market to identify generator profits under different assumptions.

## PUBLICATIONS AND PRESENTATIONS

"Automotive Class Action and Product Liability Litigation: Winning Strategies in 2019," webinar, The Knowledge Group (August 1, 2019)

"Effective Use of Statistical Evidence in Class Action Litigation: A 2019 Update," webinar, The Knowledge Group (May 20, 2019)

"Use of Experts at Certification," presentation at 2019 Bridgeport Class Action Conference (May 3, 2019)

"Examining the Many Facets of Health and Welfare Plan Litigation Relevant to ERISA," presentation at the 16th National Forum on ERISA Litigation Conference (November 16, 2018)

"Expert Analysis of Class Certification Issues," with Chris Chorba, Lee Heavner, and Peter Simon, in *Litigation Services Handbook: The Role of the Financial Expert, 6th Edition* (2017)

"Use of Statistical Sampling in Litigation," with Peter Simon, in *Litigation Services Handbook: The Role of the Financial Expert, 6th Edition* (2017)

# Appendix A

*Mark A. Gustafson, Page 15 of 15*

"Class Actions in the Health Care Space, Part IV: Use of Experts and ADR," Class Actions Webinar, American Health Lawyers Association (February 5, 2016)

"Economic Analysis of Reductions-in-Force and Pay Equity," with Flavia Bainbridge and Debo Sarkar, in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition* (2011)

"Use of Statistical Sampling in Litigation," with Peter Simon, in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition* (2011)

"Combating STAT Abuse," *Law360* (March 23, 2010)

"Challenges in RIF Analyses," with Debo Sarkar, *Law360* (March 29, 2009)

"How to Analyze Terabytes of Data with a Word," presentation, Western Users of SAS Software Conference (September 2006)

"Dynamic Code Creation Using Call Symput and the SAS Macro Language," presentation, Western Users of SAS Software Conference (September 2006)

"Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," with Geoffrey Alpert, Elizabeth Becker, Alan Meister, Michael Smith, and Bruce Strombom, presentation to the City of Los Angeles (July 2006)

"A Hybrid Approach to Valuing American Barrier and Parisian Options," with Gaurav Jetley, presentation, Conference on Computational Finance & Its Applications (April 2004)

"Cost Effectiveness of rHuEPO in Oncology," with Pierre-Yves Cremieux, Ellison Dial, Brenda Sarokhan, and Mitch Slavin, in *Recombinant Human Erythropoietin (rhEPO) in Clinical Oncology: Scientific and Clinical Aspects of Anemia in Cancer* (2002)

"California Public Employees' Retirement System: It Relies Heavily on Blue Shield of California's Exclusive Provider Network Analysis, an Analysis That is Reasonable in Approach but Includes Some Questionable Elements and Possibly Overstates Estimated Savings," presentation to the California State Auditor (March 2005)

## PROFESSIONAL MEMBERSHIPS

American Economic Association

American Bar Association

American Society of Health Economists

International Health Economics Association

Society of Labor Economists

American Risk and Insurance Association

American Health Lawyers Association

**Appendix B**
**Materials Relied Upon**

**Expert Reports and Responses to Counsel Questions**

Declaration of Eldon G. Leaphart, November 3, 2021.

Declaration of Lee M. Bowron, November 1, 2021.

Lee M. Bowron Responses to Counsel Questions, November 6, 2021.

**Legal Documents**

*Jimmy Bahn, .et al., versus American Honda Motor Co., Inc.* , Corrected Second Amended Class Action Complaint, January 15, 2020.

**Publicly Available Documents**

Acura Service Bulletin 20-001, "Center Display Unit Stays On with Ignition Turned to OFF and Door Open," February 21, 2020.

Acura Service Bulletin 20-031, "Popping/Crackling from the Speakers; Display Blank," June 18, 2020.

Acura Service Bulletin 21-009, "Warranty Extension: 2019-20 RDX MOST Bus Network Connectors," April 9, 2021, available at https://www.tsbsearch.com/Acura/21-009.

**Data**

Warranty Data through July 2020 ("Warranty Data through July 2020 - HIGH CONF.xlsx").

Updated Warranty Data, July 28, 2020 - January 27, 2021 ("Updated Warranty Data 07.28.20-01.27.21 - HIGH CONF.xlsx").